```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND

JUDY CHEZ                           *

     Plaintiff,                     *

        v.                          *   Civil No. WDQ-06-3221

MICHAEL O. LEAVITT                  *
Secretary U.S. Department of
Health and Human Services           *

                                    *
     Defendant.
                                    *
*    *    *    *    *    *    *    *    *    *    *    *    *    *
```

MEMORANDUM OPINION

Judy Chez ("Chez") sued her former employer, the Department of Health and Human Services ("the Agency"), for a violation of Title VII of the Civil Rights Act of 1964 ("Title VII").[1]

Pending is the Agency's motion to dismiss, or in the alternative, for summary judgment, and Chez's motion for leave to file a sur-reply.  For the following reasons, the motion for summary judgment will be granted, and the motion for leave to file a sur-reply will be denied.

I.   Background

Chez, a Caucasian female, worked as a Positron Emission Technologist ("PET Tech") in the Positron Emission Technology

---

[1] 42 U.S.C. § 2000, *et seq*. (2000).

1

Department at the Clinical Center.[2]  Chez was a PET Tech from September 2001 until she was terminated on February 20, 2004. Def.'s Supp. Mem. Ex. C.

Chez's immediate supervisor was Paul Baldwin, Chief PET Tech, until March 2002 when he resigned and Gerard Jacobs became her supervisor.  Gerard Jacobs Dep. 199:10-17.  Dr. Peter Herscovitch and Dr. William Eckleman, Chief of the Positron Emission Technology Department, were Chez's next level supervisors.  *Id*.  Chez worked with PET technologists Steve Sestrich, Tonya Howe, Jeff Bacon, Mark Vignoe, Terrence San Juan and Jay Chincuanco.  All the technologists reported to Jacobs. Chez Equal Employment Opportunity Commission Decision at 3.

Chez first complained of discrimination to an Equal Employment Opportunity ("EEO")counselor in May 2002.  Def.'s Supp. Mem. Ex. G.  She also told Dr. King Li, Associate Director of the Imaging and Sciences Program, about the alleged discrimination.  Def.'s Supp. Mem. Ex. E.  Li and the EEO Counselor investigated the alleged incidents, but concluded that there was no basis for a discrimination claim.

On August 14, 2002, Chez filed a formal complaint of discrimination with the Equal Employment Opportunity Commission ("EEOC").  Def.'s Supp. Mem. Ex. A.  A hearing was held from July

---

[2] This is a department within the National Institutes of Health and a branch of the U.S. Department of Health and Human Services.

12 to July 15, 2004. The issues before the Administrative Law Judge ("ALJ") were:

> whether the Agency discriminated against [Chez] "on the bases of sex and reprisal, when from September 2001 to present, she was subjected to a hostile work environment through (a) sexual comments; (b) being denied training, challenging work assignments, a change in work hours and feedback regarding her work performance; (c) the issuance of a Memorandum of Counseling on May 29, 2003; (d) the issuance of a Memorandum of Counseling on July 28, 2003; (e) placement on Performance Improvement Plan (PIP) on August 1, 2003; and (f) termination.

Chez EEOC Decision at 2.

The ALJ found that Chez had not proven by a preponderance of the evidence that she had been discriminated against or that she had been subjected to a hostile work environment. *Id.* Judgment was entered for the Agency. *Id.* Chez appealed to the Office of Federal Operations ("OFO"), and it affirmed the decision on June 29, 2006. Def.'s Mem. Ex. A. Chez's request for reconsideration of OFO's decision was dismissed as untimely on August 31, 2006. *Id.*

Chez filed this *pro se* suit on November 30, 2006. The complaint alleges that between September 2001 and February 2004 she was discriminated against on the basis of her gender when she reported: (1) her supervisor's sexist and demeaning remarks about her; (2) a male co-worker's sending a movie "Ghetto Airlines" to her and other employees; and (3) her supervisor's use of "nigger" in the department. She also complained that she had been (4) denied training; (5) received unfair schedule changes; (6) denied

3

work breaks; (7) denied proper assistance; (8) received unfair punishment; (9) received no feedback of work performance; (10) suffered retaliation for reporting a supervisor's theft; and (11) suffered continuous retaliation for asking that the harassment against her stop.  Chez Compl. at 5-6.  Chez also alleges that she was terminated for engaging in protected activity, and the above incidents subjected her to a hostile work environment.  *Id.* at 4.

II.  Standard of Review[3]

Under Rule 56(c), summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The court must view the facts and reasonable inferences drawn therefrom "in the light most favorable to the party

---

[3] In the Fourth Circuit, district courts "must be especially solicitous" when a civil rights plaintiff appears *pro se*. *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978).  The court should not assume the role of advocate for the *pro se* plaintiff, but "must examine the *pro se* complaint to see whether the facts alleged, or the set of facts which the plaintiff might be able to prove" could provide a basis for recovery.  *Id.*  "In considering the defendant's motion to dismiss, the Court will not permit technical pleading requirements to defeat the vindication of any constitutional rights which the plaintiff alleges, however inartfully, to have been infringed."  *Id.*

4

opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*quoting United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam) (internal quotation marks omitted)). The opposing party, however, must produce evidence upon which a reasonable fact finder could rely. *Celotex*, 477 U.S. at 324. The mere existence of a "scintilla" of evidence is insufficient to preclude summary judgment. *Anderson*, 477 U.S. at 252.

III. Analysis

    A.   Gender Discrimination

Under Title VII of the Civil Rights Act, it is unlawful for an employer "to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's. . . sex. . ." 42 U.S.C. § 2000e-1(a)(1) (2000). The complainant bears the initial burden to establish a *prima facie* case of discrimination. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981).

To establish a Title VII sex discrimination claim, Chez must allege that: (1) she is a member of a protected class; (2) she was qualified for the job and that her job performance was satisfactory; (3) she suffered a adverse employment action; and (4) that she was treated differently than similarly situated

employees. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *William v. Cerberonics, Inc.*, 871 F.2d 452, 455 (4th Cir. 1989). This requires the plaintiff to produce "a set of facts which would enable the fact-finder to conclude with reasonable probability that in the absence of any further explanation, the adverse employment action was the product of [sex] discrimination." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315 (4th Cir. 1993). If a *prima facie* case is established, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the challenged action. *Id.* If the employer presents a legitimate reason, the plaintiff must prove by a preponderance of the evidence that the employer's proffered reasons for the action is pretextual. *McDonnell*, 411 U.S. at 804; *Williams*, 871 F.2d at 456.

    1.   Comments

Chez argues that her co-workers, Howe, Baldwin and Jacobs, referred to her from October 2001 until March 2002 as "Bambi", and that the name was demeaning and discriminatory. Pl.'s Resp. Mem. at 11. She notes that after stepping on a nail at work her supervisor stated "Bambi got nailed" to fellow workers, and on several occasions Jacobs chanted a song to her using the word "Bambi." *Id.* The Agency admits that several employees referred to Chez by that name, but asserts that such action is not evidence of discrimination. The Agency notes that when Chez

asked Howe to stop the name calling he complied.  Def.'s Supp. Mem. at 15.  Also, Jacob stopped using the term in January 2002, and Baldwin in March 2002.  *Id.*  Thus, when Chez engaged in EEO activity, use of the term had ended.  *Id.*  Moreover, the Agency argues that Chez does not identify how frequently the term was used or any adverse employment action associated with this conduct.  Def.'s Supp. Mem. Ex. H, M and N.

Chez has proven only that the comments were made, and she found them demeaning.  The conduct of her co-workers was childish and annoying, but not sex discrimination.

2.   Training, Feedback and Challenging Work Assignments[4]

Chez asserts that she was denied training and feedback on work performance, and denied challenging work assignments in comparison to her male co-workers.  Chez states that she repeatedly asked Jacobs for more training orally and in writing, but was denied.  Pl.'s Resp. Mem. at 11.  In contrast, Chez asserts that the men always received training without written requests.  *Id.*

The Agency counters that Chez has failed to provide evidence to show that she was treated differently than males.  The Agency contends that Chez has not identified what training was denied,

---

[4] Chez also alleges that she was denied proper help compared to men in her department. Chez has presented no evidence to support a sex discrimination claim on this issue. Pl.'s Resp. Mem. at 11.

7

and when assistance and challenging work were denied. Def.'s Supp. Mem. at 9. Moreover, the Agency argues that Chez has not identified any employees who received better treatment in these areas. *Id.* The Agency also asserts that Chez acknowledges that she had been assigned to do every major type of study the PET Department performed. Def.'s Resp. Mem. Ex. S (Hearing Transcript July 15, 2004 at 483-485). Only when Chez started to have difficulty did Jacobs assign her to easier studies. H.T. July 15, 2004 at 297-299. Further, the Agency argues that Chez received feedback on her performance when she was placed on a performance improvement plan and received a negative performance evaluation. Def.'s Resp. Mem. at 4 n.3.

    Chez's assertions of disparate treatment are insufficient to sustain a sex discrimination claim. Chez has not specified the training or work opportunities denied nor identified the benefits males received. Chez acknowledges that she participated in several major studies, but asserts that she wanted to participate in others. Chez's inability to choose her assignments is not evidence of discrimination. Further, the Agency has articulated a legitimate reason--her skills-- for assigning her easier studies. Chez also has not alleged that she suffered any adverse employment action because of the alleged denial of training and quality work assignments.

8

3.   Work Hours

Chez also complains that--unlike men--she was denied breaks during her work hours. Chez notes that she would work for ten hours a day without a break because she was often scheduled to work alone. Pl.'s Resp. Mem. at 11. Chez argues that the men in the department always seemed to get breaks and did not work for equally long periods. *Id.*

Chez also argues that her male co-workers were given preferential shift changes, and she was denied this benefit. Chez complains that she requested a shift change from her manager because she feared working alone with her co-worker, Jay Chincuanco, but her request was denied. Pl.'s Resp. Mem. at 41. Chez argues that when Vignoe and Howe requested schedule changes they were granted even though it left the lab understaffed. Pl.'s Resp. Mem. at 23, 41.

The Agency counters that there is no evidence to support this claim. The Agency argues that Chez's request was denied because there was a need for coverage later in the afternoon, and Chez provided no valid reason for the schedule change. Def.'s Resp. Mem. at 6; Def.'s Ex. T. The Agency asserts that Vignoe and Howe were offered schedule changes to alleviate commuting problems and provide coverage in the afternoons. Def.'s Resp. Mem. Ex. S. In addition, the Agency notes that Jacobs permitted Chez to adjust her work schedule several times for medical

9

reasons and was given compensatory time off.  Def.'s Resp. Mem. Ex. CC.

Chez has failed to prove that denial of a schedule change was discriminatory.  The Agency provided a valid reason for denying Chez's request, while granting the requests of other employees.  Moreover, Jacobs stated that he adjusted Chez's work hours on several occasions for medical and personal reasons, and she does not deny that such requests were granted.  Chez also provides no evidence that Chincuanco posed a threat to her or that she was assigned to work with him in an effort to harass her.  Further, Chez has proffered no evidence that she worked longer hours or received fewer breaks than men.  Other than her own assertions, Chez provides no evidence to support this claim such as dates, time cards or any other proof of preferential treatment.

4.  Discipline

Chez also argues that she was disciplined differently than male employees.  Chez contends that she was terminated for misconduct in front of patients even though she had received two prior satisfactory evaluations.  She also argues that the men in her department who engaged in similar misconduct received more lenient discipline.  Pl.'s Resp. Mem. at 12.  In support of this argument, Chez cites the reprimand Vignoe received for his two transmission scan errors, the discipline Chincuanco received for

10

his verbal outburst, and the penalty Bacon received for sending an offensive email.  Pl.'s Resp. Mem. at 24-29.

The Agency counters that the discipline the male employees received was appropriate.  The Agency asserts that when Vignoe committed error with two transmission scans, Jacobs counseled Vignoe, and placed comments in his mid-year evaluation about the incidents.  Def.'s Supp. Mem. Ex. B. (H.T. July 15, 2004 at 222-224).  Moreover, Vignoe's second incident was caused by a computer glitch, and therefore disciplining him would have been inappropriate.  *Id.*  The Agency asserts Chincuanco was counseled, issued a written memorandum of counseling, and directed to attend anger management training for his one-time outburst.  *Id.*, Ex. E (H.T. July 14, 2004 at 246-251); *see also Id.*, Ex. I.  For sending the "Ghetto Airlines" email--his first offense--Bacon received a letter of reprimand.  The Agency argues that, unlike these individuals, Chez had a pattern of misrepresentation which led to her termination.[5]  Def.'s Supp. Mem. at 10.  (H.T. July 13, 2004 at 28-24).

---

[5] Chez received two memoranda of counseling, a negative performance evaluation and a Performance Improvement Plan ("PIP") before she was terminated.  EEOC Decision at 30. Moreover, Maureen E. Gormley ("Gormley"), Chief Operating Officer and deciding official for the removal, discovered that Chez had engaged in inappropriate behavior in front of patients, made serious errors on studies and blamed others for them, and had conflicts with researchers, who then had requested that Chez not be assigned to their studies. *See* H.T. July 13, 2004; *see also* Def.'s Resp. Mem. Ex. AA.

11

Chez has failed to establish a claim of disparate treatment in discipline. The Agency introduced evidence of the discipline other employees received for their misconduct. The evidence of Chez's poor work performance and misrepresentations were substantiated by testimony from Gormley , and written documentation. Moreover, Chez was offered several opportunities to improve her work performance before being terminated. Thus, Chez cannot establish a sex discrimination claim based on the allegedly lenient discipline received by men.

    B.   Hostile Work Environment

A claim for hostile work environment requires harassment that was: (1) unwelcome; (2) based on sex; (3) severe or pervasive enough to alter the conditions of employment and create an abusive atmosphere; and (4) a basis for imposing liability on the employer. *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998); *see Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 772 (4th Cir. 1997). In hostile work environments, the workplace is "permeated with 'discriminatory intimidation, ridicule, and insult,'[sufficiently] severe [or] pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Several factors determine whether an environment is hostile, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or

12

humiliating, or a mere offensive utterance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998). "Simple teasing, off-hand comments, and isolated incidents (unless extremely serious)" is not discrimination. *Id.* at 788.

Chez argues that the Agency subjected her to harassment through denial of training and challenging work assignments, denial of schedule changes and work breaks, and being subject to sexual comments, i.e., repeatedly being called "Bambi". Chez asserts that when she reported these incidents she was harassed and treated differently than male employees. In addition, Chez alleges that the issuance of the memoranda of Counseling on May 29, 2003 and July 28, 2003, placement on PIP on August 1, 2003, and her subsequent termination on February 20, 2004 were harassment.

The Agency counters that there is no evidence of frequent or severe harassment; thus there was not a hostile work environment. The Agency asserts that many of Chez's complaints occurred only once, this is not severe and pervasive conduct. The Agency also argues that the events that led to the work improvement memoranda and termination were based on serious work performance concerns. Further, the Agency asserts that Chez has failed to substantiate her claims that the other incidents were related to sex discrimination.

Chez's evidence does not establish a hostile work

13

environment.  She has provided no details regarding the frequency of the "Bambi" comments.  Even though the Agency concedes that the comments were made, this does not prove they were so severe or pervasive to create a hostile environment.  At most, the behavior was childish and annoying.  Further, the discipline and work performance documentation was not harassment because the Agency had provided legitimate reasons related to Chez's poor work performance for her termination.[6]  As to Chez's other allegations, other than her own assertions, she has failed to establish that such incidents were based on discrimination.  Accordingly, Chez's hostile work environment claim fails.

   C.   Retaliation

   Under Section 2000e(3)(a), it is unlawful to discriminate against any employee who "has opposed any practice made an unlawful employment practice. . . or . . . has made a charge, testified, or assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e(3)(a).

   To establish a *prima facie* case of retaliatory treatment, Chez must show that: (1) she engaged in protected activity; (2) the employer took adverse employment action against her; and (3) a causal connection between the protected activity and the

---

[6] *See* Def.'s Resp. Mem. Ex. AA  (Proposed removal letter specifying the incidents supporting Chez's termination).

14

adverse action. *Ross v. Commc'n Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985); *see, e.g. Smalley v. City of Eatonsville*, 640 F.2d 765, 769 (5th Cir. 1981). The burden then shifts to the employer to produce a legitimate, non-discriminatory reason for the adverse action. *Womack v. Munson*, 619 F.2d 1292, 1296 (8th Cir. 1980).

Chez states that she reported several incidents to Jacobs including (1) another supervisor made sexist and demeaning remarks toward her, (2) the assistant supervisor, Sestrich, said "nigger" several times in the workplace, (3) a racist movie was sent using an NIH email account, and (4) that several employees referred to her as "Bambi." Pl.'s Resp. Mem. at 8. Chez argues that in retaliation for reporting these protected activities she was terminated. *Id.* Further, Chez asserts that the reports made about her work performance were false and made to get her fired. Pl.'s Resp. Mem. at 13. Chez notes that Jacobs wanted to get rid of her, and in an effort to have her terminated sent a November 4, 2003 email to Gormley that stated "CAN WE PLEASE DO SOMETHING ABOUT HER." Pl.'s Supp. Mem. Ex. 2. Chez argues that this email to Gormley resulted in her termination. *Id.*

The Agency counters that Chez cannot demonstrate a causual connection between the protected activity and the allegedly adverse employment action. The Agency asserts that Chez was removed in February 2004, 21 months *after* she first engaged in

15

protected activity.  Def.'s Supp. Mem. at 12.  Moreover, there is no evidence that the charges for her removal were without merit or retaliatory.  *See supra* text accompanying note 5; *see also* H.T. July 13, 2004 at 29-43.  The Agency notes that Gormley testified that she "did a lot more due diligence" before making the decision, including meeting with Chez to discuss the removal charges and then meeting with witnesses "to see if any of them would corroborate [her] side of the story."  Def.'s Resp. Mem. at 9 (H.T. July 13, 2004 at 26-27).  Gormley found that no one corroborated Chez's story.  *Id.*  The Agency also asserts that Jacobs' email does not support a claim of retaliation because it did not specifically ask to get rid of Chez, but rather highlights the poor working environment that resulted from Chez's complaints.  Def.'s Resp. Mem. at 7.  More importantly, the Agency observes that Gormley was never sent a copy of the email; thus, no causal connection can be made.  Def.'s Resp. Mem. at 7-8 n.4 (Pl.'s Supp. Mem. Ex. 2).

It is undisputed that Chez engaged in protected activity when she reported alleged acts of discrimination.  Chez claims she was fired for reporting these incidents and in response to Jacobs sending a negatively charged email to Gormley.  This evidence establishes a *prima facie* case of retaliation, however, it does not prove retaliatory discharge.  The Agency offered several legitimate, non-discriminatory reasons for terminating

16

Chez related to her work performance and misconduct in front of patients.  Even if the Jacobs's email was sent to Gormley, this does not negate the legitimate work performance reasons the Agency had for her removal; these reasons were unrelated to Jacobs' frustrations with Chez.  The two year lapse between Chez's reports of discrimination and her termination is too long to establish causation absent other evidence of retaliation. *Causey*, 162 F.3d at 803 (4th Cir. 1998) (thirteen month interval between initial charge and termination was too long to establish causation absent other evidence of retaliation).

    D.   Motion for Leave to File Sur Reply

Chez contends that the Agency, in their supplemental reply brief, made several false and new statements, and she should have an opportunity to respond.  Specifically, Chez argues that: (1) there is no evidence that she was combative; (2) Gormley did not use "due diligence" in deciding to terminate her; (3) Bacon did not receive a reprimand for his misconduct; (4) Vignoe did not receive disciplinary action for his misconduct; and (5) Bacon received a $2500 bonus after she reported him harassing her. Chez asserts that it would be unfair, unjust and prejudicial to deny her an opportunity to respond.

Chez has failed to establish a gender discrimination claim. Chez's complaints about the Agency's reply brief do not help her establish her claim. The Agency's reply brief provides no new

17

evidence which requires a response, thus a supplemental brief by Chez would not aid the Court.  Accordingly, Chez's motion for leave to file a sur-reply will be denied.

IV   Conclusion

For the previously stated reasons, the Agency's motion for summary judgment will be granted, and Chez's motion for leave to file a Sur-Reply will be denied.


<u>August 30, 2007</u>                              <u>        /s/            </u>
Date                                      William D. Quarles, Jr.
                                          United States District Judge